STANOLIND OIL AND GAS COMPANY
(now Pan American Petroleum Corporation), Plaintiff,

v.

Barney BRIDGES, d/b/a Barney Bridges Construction Company, Defendant.

Civ. No. 3577.

United States District Court
E. D. Oklahoma.

Feb. 24, 1958.

The plaintiff, Stanolind Oil and Gas Company, a Delaware corporation (now Pan American Petroleum Corporation) instituted this action against the defendant, Barney Bridges, an Oklahoma citizen, doing business as Barney Bridges Construction Company, to recover some $70,000 allegedly overcharged Stanolind by Bridges, between October 30, 1950, and about August 1, 1953, while Bridges was doing dirt work for Stanolind.[1]

Beginning October 30, 1950, and continuing through June 25, 1953, Stanolind and Bridges, through letters and other writings, agreed to the terms and conditions under which the controverted earthwork would be done.[2]

Pursuant to such contract, Stanolind employed Bridges to do dirt work on various leases of the plaintiff; this work included building roads, leveling ground for the erection of derricks, digging pits, filling pits and related lease maintenance work.

Bridges was employed through the following procedure:

The Stanolind employee in charge of the lease needing dirt work, issued to Bridges a Field Purchase Order.[3] After receiving authorization, Bridges was instructed as to the lease location and the type of work needed. Occasionally, Bridges was hired to do work prior to the delivery to him of the FPO. However, in all cases, the FPO was given to Bridges before commencement of, during, or immediately after completion of the job. Each FPO carried a particular number, identified the lease and described the required work.

During the controverted time, Stanolind employed Bridges to do 994 jobs. For these jobs, Stanolind was separately billed on 994 invoices. For this work, Stanolind was billed a total of $361,544.-10; this amount was paid.

Each invoice submitted showed the work done, the hours worked, the equip-

The report of Special Master David A. Kline follows:

1. $70,638 is sought. $6,878 for 1950; $39,038 for 1951; $20,877 for 1952; and, $3,845 for 1953. See PX–24, PX–16, PX–11 and PX–26, respectively.

2. See PX–4, items 1–13.

3. Referred to herein as FPO.

ment used, the kind of operator employed and the hourly compensation claimed.

Both parties understood that the submitted invoices had to correspond with the issued FPO's, both as to job location and kind of work done. Naturally, the equipment used was determined by the nature of the work involved.[4] Moreover, it was understood that each invoice must correspond with the applicable rate schedule, previously submitted by Bridges, and that Bridges could only invoice for work done, or equipment used, where such was specifically carried on the written rate schedule.

Stanolind did a large amount of drilling and oil development work, during the time, and in the area in which, Bridges was employed. And, Stanolind failed to keep an accurate check on the actual hours Bridges' equipment was used on each job.[5] Except for sporadic job-site checking, Stanolind's verification was limited to office paper-work comparison.[6] By this office inquiry, Stanolind collated the submitted invoice with the corresponding FPO, checking lease location, kind of work, and hourly charge. This examination made certain that the hourly charge invoiced tallied directly with the charge for comparable work set out on the applicable rate schedule.

Stanolind relied upon Bridges to accurately report on each invoice the job hours required. And, Bridges knew, that for the most part, Stanolind assumed the number of hours invoiced by him to be right and proper.

Early in 1953, Stanolind first questioned the correctness of these invoices; it requested, and received, permission to examine Bridges' books and records. After a cursory survey by Stanolind, Bridges withdrew permission for further inspection of these records.

This limited investigation revealed some evidence that overcharges had occurred. Certain irregular alterations appeared; and, these alterations were reflected by increased billings to Stanolind. Moreover, there was evidence that Stanolind had been invoiced for work not properly allocable to it, such as repair work performed on Bridges' equipment by Bridges' employees.

After this lawsuit was filed, Bridges' records were carefully studied and audited by Stanolind's accountant, pursuant to court order.

These books and records presented for examination were incomplete and, in instances, inaccurate. Bridges' own certified public accountant, employed for this trial, after auditing these books and records, testified that he could not certify either to his audit or to the dependability of his conclusions, because of the incompleteness of the books and records.[7]

Bridges urges that a portion of the alleged overcharges can be explained in that moving, or en route, time was invoiced under the classification of bulldozer time, and that he was entitled to so bill. Thus, logically, the first issue for disposition is whether or not the defendant could, under his contract with Stanolind, include in the invoices submitted to Stanolind, time spent moving equipment to and from the different project sites.

4. For example, a bulldozer would be used to dig or fill pits and for similar dirt moving jobs. A grader would be employed to build roads and level locations.

5. Because of the scope of the drilling and development operations, Stanolind could not, with the number of employees it had in the area, keep an on-the-site record of the hours required to do the ordered dirt work. The "Form 08", signed by the employee of Stanolind requesting the work, indicated that the work ordered by the companion FPO was completed. The employee signing the "Form 08" relied, almost exclusively, on Bridges to accurately invoice the actual hours worked.

6. See testimony of Stanolind employees Marsh, Richardson, Bronaugh, McNatt, Merritt and Easley.

7. For example, the daily time tickets of defendant's employees for the years 1950, 1951, and 1952, had been disposed of prior to this audit.

■ ■ The working agreement between the parties was in writing, was clear and unambiguous, and did not provide for any such billing. Until April 25, 1953, the rate schedules submitted by Bridges, which set forth the terms on which Bridges would work, contained no provision indicating a charge would be made for moving the hired equipment.[8] And, the master has concluded that all such charges were unauthorized.

Although the defendant, and a former employee of Stanolind, Don Crall, Stanolind's Field Supervisor during the contested period, both testified that Bridges and Crall had orally agreed that the defendant could inflate the actual hours worked by bulldozer equipment, with en route time chargeable at the working dozer rate,[9] such evidence does not justify the en route time billings.

■ ■ If Crall's agency were the vital determinant, doubtless, it should be ruled that Crall possessed at least "ostensible authority" to contract for Stanolind on the subject matter involved herein.[10] However, Crall's authority when the alleged conversation took place is not controlling. Both Crall and Bridges fix the time of the alleged oral agreement prior to the written instruments which composed the final understanding between the parties. All oral negotiations were merged in this written agreement.[11] Moreover, in the absence of fraud, accident or mistake, parol evidence is inadmissible to vary the terms of an unambiguous written contract.[12]

It is difficult to believe Bridges was in good faith in secretly billing en route time.[13] However, if the early, oral negotiations led Bridges to think these covert charges were authorized, the subsequent letters and submitted rate schedules composing the written agreement between the parties should have disabused his mind of this earlier impression.[14] For en route time to be billable, Bridges

8. A binding contract may be made up of a number of different writings, so long as they are not conflicting. Brake v. Blain, 1915, 49 Okl. 486, 153 P. 158; Nelson v. Golden, 1921, 84 Okl. 29, 202 P. 308; Automotive Parts Co. v. C. I. R., 6 Cir., 1943, 134 F.2d 420.

9. That is, $10 per hour for a TD14 dozer; and, $12 per hour for a TD18 dozer.

10. As mentioned by witness Kerr, Stanolind's former District Production Superintendent, "Don Crall was the Stanolind Oil and Gas, as far as contractors like Bridges were concerned." In regard to "ostensible authority" see Rosser-Moon Furniture Company v. Oklahoma State Bank, 1943, 192 Okl. 169, 135 P.2d 336, 338; Knapp v. Ottinger, 1951, 206 Okl. 113, 240 P.2d 1083, 1086; Crane Company v. James McHugh Sons, 10 Cir., 1939, 108 F.2d 55, 58, 59. Cf. Truscon Steel Company v. Cooke, 10 Cir., 1938, 98 F.2d 905, 909; 2 C.J.S. Agency § 96.

11. Koenig v. Hubbard, 1945, 196 Okl. 149, 163 P.2d 536, 538; Brewer v. National Surety, 10 Cir., 1948, 169 F.2d 926, 928; Thompson v. E. W. Jones, Inc., 1941, 189 Okl. 480, 118 P.2d 196.

12. Garrison v. Kress, 1907, 19 Okl. 433, 91 P. 1130; Goldstein v. Welded Products Co., 1945, 196 Okl. 219, 164 P.2d 229; See 15 Okl.Stat. § 137, which provides: "The execution of a contract in writing, whether the law requires it to be written or not, supersedes all the oral negotiations or stipulations concerning its matter, which preceded or accompanied the execution of the instrument." Cf. Hicks v. Mid-Kansas Oil & Gas Company, 1938, 182 Okl. 61, 76 P.2d 269.

13. Early in these proceedings, Bridges testified that he regularly submitted to Stanolind a written statement showing that he charged $10 per hour en route time. See footnote 17, infra. Yet, he told his accountant Mrs. King that it was unnecessary to include en route time on the rate schedules. When Bridges first learned Stanolind was inquiring into the matter of overcharges, he promptly submitted a rate schedule which recited a specific charge for moving time; this was the *only* rate schedule ever submitted to Stanolind setting out such a charge. See PX–4, item 1.

14. PX–4, item 13, states that Bridges must furnish a rate schedule showing the hourly rate charged by him "for all types of *equipment* and *labor* used." And, in PX–4, item 11, Stanolind again advised Bridges to "Please forward original and two copies of your rate schedule, covering all *equipment* and *work performed* by your company." (Emphases supplied.)

should have listed such charge on his rate schedule.[15]

Other factors totally discredit Crall's testimony that this oral agreement existed.[16]

■ The defense of a parol understanding that en route time could be billed under another name was not immediately urged when the instant controversy arose. Initially, the defendant asserted that the en route time billing was a matter of trade custom and usage.[17] And, when Bridges identified the various Stanolind employees who knew he made such a charge, he named five employees, but did not include Crall in this group.[18] Inasmuch as Bridges first testified he had no oral agreement to charge for en route time, but that he did so as a matter of custom and usage, he cannot later successfully assert a specific oral understanding. The testimony initially given must be deemed true and binding.[19]

■ The evidence is convincing that during the period in suit, en route or moving time was regularly charged by Bridges, and that such charges were not authorized. The evidence does not dem-

15. This failure was critically deficient. The rate schedules submitted by Bridges contained the precise terms on which Bridges would work. When Stanolind prepared an FPO, such FPO constituted an unambiguous contractual offer, when considered with the applicable rate schedule. Bridges accepted such offer by performing the requested work.

16. This case was filed August 11, 1953. Defendant's deposition was taken September 9, 1953. At that time he did not testify to any such agreement. And, on February 11, 1955, when Bridges testified before the master, no reference was made to a special agreement or understanding. Other impeaching circumstances are: (1) Kerr testified that Crall told him Bridges did not charge moving time and that such was the reason so much work was given Bridges; (2) Harrison testified that Crall told him Bridges did not charge moving time; (3) Crall testified that he did not know whether Bridges set out a charge for moving time in his rate schedule; (4) When Crall was called before Stanolind's management committee, he offered no explanation for the alleged overcharges, and made no mention that he had agreed with Bridges that he could deviate from the rate schedule; (5) The minutes of the meetings in the Stanolind's Duncan office contradict Crall's testimony that charges for moving time were discussed at such meetings.

17. On February 11, 1955, before the master, the defendant testified:
"Q. Now Mr. Bridges, did you have —what kind of an agreement did you have with Stanolind as to the charges to be made for work done? A. It's the same agreement with all oil companies. They don't, we don't show trucking on one out of a hundred. We just show bulldozer time, where we have a truck driver's time paid by the hour, we let the cat-skinner, he drives the cat-tractor, he doesn't drive the truck; the truck driver moves it, if it's two hours we add it on to the tractor time.
"Q. Now I asked you, Mr. Bridges, what kind of agreement you had with Stanolind with reference to charges which you were to get for the work you did for them. A. I didn't have an agreement. I sent them a statement every month, I believe it was every six months, showing that I charged $10.00 an hour for moving tractors. * * *
"Q. Did you ever have any oral understanding with anybody connected with Stanolind that you were charging for moving time? A. I'd say everybody that writ orders for them knew it. * * *
"Q. Now, Mr. Bridges, why didn't you enter that on Stanolind's bill as moving time? A. Well, I can't answer that because that's just the way its been worked for the last, since 1937, since I've been in business. I do not know that.
"Q. Did you ever have an understanding with anybody that worked for Stanolind that you were charging the moving time as cat-time? A. No, I don't say I ever had any understanding. They all knew how I charged it."

18. The employees named were Marsh, Moore, Beamon, Barrett and McNatt.

19. See 32 C.J.S. Evidence § 1040 c, pp. 1111–1112. Cf. Harlow v. Laclair, 1927, 82 N.H. 506, 136 A. 128, 131, 50 A.L.R. 973, wherein it is said: " * * * when a party testifies to facts in regard to which he has special knowledge, such as his own motives, purposes, or knowledge, or his reasons for acting as he did, the possibility that he may be honestly mistaken disappears. His testimony must be either true or deliberately false."

onstrate with exactitude the amount of such overcharges; but, it is possible to determine this amount within a reasonable approximation.[20]

After June 25, 1953, a rate schedule was submitted by Bridges, which included a specific charge for en route time. For a period of five or six weeks Bridges was employed to do some 27 jobs on different leases. The defendant billed Stanolind for moving time on 17 of the invoices and made no such charge on 10 of them.[21] The average en route time per invoice during this employment period was 2 hours. The ratio of 17 to 27 is 63%. A total of 994 invoices is involved herein. From this must be deducted the 27 invoices which arose after June 25, 1953. Sixty-three percent of this 967 is 609. Two hours for each of the 609 invoices constitutes 1218 hours. And, $10 an hour for 1218 hours totals $12,180.

Separate and distinct from the en route time overcharge issue, Stanolind urges that it has presumptively established, unrebutted by Bridges, that during the time in suit Bridges overcharged Stanolind for an additional 5803.8 hours or $58,038.

▆▆▆▆ Plaintiff's evidence carries some implication that overbillings, in addition to en route time, occurred. However, such evidence is not sufficiently clear, either in defining the character of the overcharges or the amount there-

of, to justify a judgment. Speculation and conjecture are unacceptable components of an award for damages; such an award must have a rational basis.[22]

This phase of Stanolind's case is supported by an accounting audit and analysis which in turn is centered upon Bridges' payroll records.[23] This accounting analysis is as thorough and consistent as it could be under the circumstances. However, the conclusions sought cannot be established from the available data.

The agreement between the parties provided for the hiring of specific equipment, such as dozers or graders, at a fixed hourly sum; this amount included a machine operator. But, the available payroll records of Bridges cannot, of themselves, demonstrate the actual volume of work done by Bridges, the fact critical to recovery by Stanolind.

For example, the daily time tickets of defendant's employees for the years 1950, 1951 and 1952 were disposed of prior to audit.[24] Moreover, records showing wages paid employees carried as dozer operators are not conclusive. Such compilations do not embody hours wherein Barney Bridges, personally, A. C. Bridges, who also was not on a salary,[25] and other employees not carried on the payroll as dozer operators, drove bulldozers.

Furthermore, even though a strong inference may be drawn from these books and records that Bridges' customers were invoiced for machinery hours

20. Uncertainty as to the exact damage does not prevent recovery where a reasonable basis exists for an award. Firestone Tire & Rubber Company v. Sheets, 1936, 178 Okl. 191, 62 P.2d 91, 93; Bigelow v. R K O Radio Pictures, 1945, 327 U.S. 251, 264, 66 S.Ct. 574, 90 L.Ed. 652.

21. The defendant, himself, testified he was only entitled to en route time one way, except on small jobs. Moreover, much of the equipment was moved by its own power, rather than hauled, because of the close proximity of many of the jobs.

22. "The damages recoverable in any case must be susceptible of ascertainment with a reasonable degree of certainty. * * * Damages which are uncertain, contingent, or speculative cannot be re-

covered either in actions ex contractu or actions ex delicto." 15 Am.Jur. p. 410. Also, see 25 C.J.S. Damages § 144, pp. 788, 789. Cf. Oklahoma City v. McAllister, 1935, 174 Okl. 208, 50 P.2d 361, 362.

23. As to the competency of the manner in which Stanolind's accountant testified, using tabulations, charts and summaries, see Gross v. United States, 9 Cir., 1953, 201 F.2d 780, 787; Hooven v. First National Bank, 1929, 134 Okl. 217, 273 P. 257, 66 A.L.R. 1203. Also, cf. 66 A.L.R. at page 1206 et seq.

24. Only tickets for 1953 were available. See footnote 7, supra.

25. PX–33 includes some time tickets for A. C. Bridges. However, these are incomplete.

which exceeded hours paid operators, and beyond the number of work hours reasonably to be expected from the amount of equipment owned by Bridges, it is impossible to determine what portion of any such overcharges were made of Stanolind. Conceivably, any segment, or all, of overcharges so made, if any, could have been at the expense of companies for which Bridges worked other than Stanolind.[26]

■ The customary burden of proof remains unaltered by the facts here attendant. Under some circumstances a prima facie showing shifts the evidential obligation to the defendant to come forward and explain circumstances suspicious in character. This rule has been applied where the defendant is obligated to keep a complete and accurate set of books, and is fostered by the principle that where a defendant is in a better position than the plaintiff to establish the true facts, inaction in the wake of a prima facie case constitutes an implied admission to the facts asserted.[27]

■ This rule is inapplicable here. Bridges had no duty, contractual, statutory, or common-law, to keep an accurate and complete set of books. Although the slipshod manner in which these books were handled offends sound business practice, Stanolind has no standing to profit therefrom. No one can seriously contend that Bridges is better positioned than Stanolind to prove the controlling facts. Bridges' inaction, at this point, cannot be interpreted as an implied concession that the conclusions urged by Stanolind are true.

Plaintiff's action is not barred by laches, voluntary payment or ratification.

■ Laches is inappropriate where there is no evidence of record showing prejudice to the defendant because of delay.[28] There can be no claim of voluntary payment since Stanolind did not knowingly pay, and intend to pay, an illegal or unfounded claim with full knowledge of groundlessness.[29] And, there can be no ratification where, as here, the true facts are unknown.[30]

The master recommends that Stanolind be given judgment for $12,600.[31]

Fischl & Culp, Ardmore, Okl., for plaintiff.

Wilson Wallace, Ardmore, Okl., for defendant.

WALLACE, District Judge.

Now on this 24th day of February, 1958, there came on for hearing the objections of the defendant to the Special Master's Report filed herein and the Court having heard argument of counsel and being fully advised in the premises

26. Added confusion results from the fact that the available records show approximately 500 hours of time paid operators of Bridges where the operator's daily or bi-weekly time tickets indicate the work was done for Stanolind but where Bridges' books do not show that Stanolind was billed for such work.

27. See Hunter v. Shell Oil Company, 5 Cir., 1952, 198 F.2d 485, 490; 31 C.J.S. Evidence § 113, pp. 721, 722.

28. American-First National Bank of Oklahoma City v. Peterson, 1934, 169 Okl. 588, 38 P.2d 957, 962. Also, see Parks v. Classen Company, 1932, 156 Okl. 43, 9 P.2d 432, 435, 436; 30 C.J.S. Equity § 118. Cf. Benedict v. City of New York, 1919, 250 U.S. 321, 326–328, 39 S.Ct. 476, 63 L.Ed. 1005; City of Erlanger v. Berkemeyer, 6 Cir., 1953, 207 F.2d 832, 38 A.L.R.2d 918, certiorari denied 346 U.S. 915, 74 S.Ct. 275, 98 L.Ed. 411.

29. Farren v. Willard, 1926, 76 Cal.App. 460, 245 P. 206; Mercantile-Commerce Bank & Trust Co. v. Equitable Life, D.C. 1926, 48 F.Supp. 561. Stanolind employees who approved the invoices for payment, including Kerr, Harrison, Richardson and Marsh, specifically testified they did not know Bridges was secretly billing en route time, and would not have authorized payment had they so known.

30. McCray v. Sapulpa Petroleum Company, 1923, 102 Okl. 108, 226 P. 875; cf. Bentley v. Zelma Oil Company, 1919, 76 Okl. 116, 184 P. 131.

31. To the en route time overcharge of $12,180 must be added, items 1 and 2 of PX-26, totalling $420, which admittedly was erroneously billed Stanolind by Bridges.

finds the defendant's objections should be overruled and that judgment according to the Special Master's Report should be entered for plaintiff.

It Is, Therefore, Ordered, Adjudged and Decreed that the defendant's objections to the Special Master's Report are hereby overruled and that the Special Master's Report be and the same is hereby adopted as the judgment of this Court and the plaintiff is accordingly given judgment against the defendant for $12,600.